PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BOBBY OJOSE, | ) | |
| | ) | CASE NO. 4:16CV2952 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| YOUNGSTOWN STATE UNIVERSITY, *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendants. | ) | [Resolving ECF No. 48] |

Pending before the Court is Defendants Marcia Matanin, James Tressel, Martin Abraham, Charles Howell, Kevin Reynolds, Cynthia Kravitz, and Ken Learman's Motion for Judgment on the Pleadings. ECF No. 48.[1] Plaintiff Bobby Ojose has responded. ECF No. 67. Defendants have filed a reply. ECF No. 68. The Court converts Defendants' motion from a Rule 12 motion to a Rule 56 motion. For the reasons that follow, the Court grants Defendants' motion in part.

**I. Background**

Plaintiff, an African-American, began working as an Assistant Professor in Youngstown State University's Department of Teacher Education in July 2013. ECF No. 39 at PageID #: 297. During that time, he published a book, wrote four peer-reviewed articles, and gave multiple conference presentations. *Id*.

---

[1] ECF No. 48 and all of its attachments are filed under seal.

(4:16CV2952)

During all relevant times, Defendants' roles at YSU were as follows. Dr. Marcia Matanin chaired the Department of Teacher Education at YSU. Charles Howell was Dean of the Beeghly College of Education at YSU. (The Department of Teacher Education is part of the Beeghly College of Education.) Howell reported to Provost and Vice President of Academic Affairs Dr. Martin Abraham, who, in turn, served under President James Tressel. Kevin Reynolds was YSU's Chief Human Resources Officer. Cynthia Kravitz was director of YSU's Office of Equal Opportunity and Policy Development. Ken Learman chaired YSU's Professional Conduct Committee.

**A. SPA Report**

As part of his work at YSU, Plaintiff participated in drafting the 2013-14 SPA Report that YSU professors submitted to the National Council of Teachers of Mathematics. *Id.* at PageID #: 298. In September 2015, Marcia Matanin, chair of the Department of Teacher Education and a contributor to the SPA Report, initiated charges against Plaintiff with the Professional Conduct Committee for falsifying data in the SPA Report. *Id.* Plaintiff alleges that Matanin met with Charles Howell and Ken Learman, chair of the Professional Conduct Committee. *Id.*

On December 14, 2015, the Committee issued its final report, finding that "there was sufficient evidence to support the allegation of "creation and falsification" of assessment data provided in a formalized Specialized Professional Association (SPA) report to the National Council of Teachers of Mathematics (NCTM)." ECF No. 48-12 at PageID #: 428. The Committee found that "[t]here was evidence that an addendum used to create assessment data was provided in the SPA report, but no evidence of how the addendum was implemented on any

2

(4:16CV2952)

cohort of students." *Id*. Additionally, the Committee found evidence that Plaintiff submitted those materials to Matanin on August 18, 2015, but there was no evidence that Plaintiff was "instructed, encouraged, or coerced into creating assessment data that did not exist." *Id*.

On January 8, 2016, Plaintiff submitted a letter of appeal to Tressel. ECF No. 67-102. On February 3, 2016, Learman asked Tressel if Plaintiff had appealed the Professional Conduct Committee's report. Tressel, in turn, asked Abraham to respond to Learman's question. ECF No. 67-109. The following day, Abraham wrote to Learman that "[t]o the best of our knowledge, Prof. Ojose has not filed an appeal." *Id.* at PageID #: 1491.

**B. Evaluations**

As part of the review process in the Department of Teacher Education, the department chairperson evaluates the professors in the department. In each evaluation, the chairperson rates the professor on three categories: teaching, scholarship, and university service. In each category, the chairperson assigns the professor one of five ratings: "very weak," "weak," "satisfactory," "strong," and "very strong."

In his evaluation for the 2014-15 academic year, Plaintiff received ratings of "weak" in teaching, "strong" in scholarship, and "satisfactory" in university service. ECF No. 48-2 at PageID #: 388. Matanin explained that three students contacted her to discuss issues regarding Plaintiff related to his communication, professionalism, and grading. *Id.* at PageID #: 389. One student engaged in a dispute with Plaintiff regarding handing in an assignment. The student mistakenly claimed she submitted the assignment, when in reality, the email was stuck in her outbox. ECF No. 48-3 at PageID #: 408. She described the mix-up as a "simple technology

3

(4:16CV2952)

error." *Id*. Plaintiff, on the other hand, characterized the episode as "a plain case of a student lying," and told the student that he "get[s] uncomfortable when students tell stupid lies." ECF No. 48-3 at PageID #: 408-09 (emphasis omitted).

In addition, Plaintiff summarized evaluation data on twelve individuals, three African-American and nine Caucasian. ECF No. 67-6. Eleven of those individuals received evaluations from the chairperson. No Caucasian professor received a rating below "satisfactory," and each of the three African-American professors received at least one rating of "weak." Two of the African American professors, Deborah Graham and Betty Green, each received one rating of "very weak." No African American professor received a rating of "very strong," whereas seven of eight Caucasian professors received at least one rating of "very strong."

On October 8, 2015, Plaintiff emailed a letter to Tressel and Abraham, in which he claimed that Matanin was giving him lower scores on his evaluations than similarly-situated Caucasian professors and that Howell and Matanin were trying to make him the fall guy for the SPA report. ECF No. 48-7. Abraham forwarded the email to Cynthia Kravitz, director of YSU's Office of Equal Opportunity and Policy Development. ECF No. 48-8.

### C. Resignation

Ojose was not a tenured member of the YSU faculty. He was, however, a probationary employee, on the tenure track. Prior to applying for tenure, a tenure-track employee must complete a pre-tenure review. ECF No. 67-2 at PageID #: 646-47. Plaintiff planned to turn in the paperwork to begin his pre-tenure review by February 2016. ECF No. 67-3.

4

(4:16CV2952)

On October 28, 2015 Howell informed Plaintiff that he intended to recommend that Plaintiff not be reappointed as a tenure-track employee. ECF No. 67-4. On November 1, 2015, Plaintiff emailed various individuals a copy of his letter of resignation. ECF No. 67-5. The resignation was effective at the end of the 2015-16 Academic Year. *Id*. at PageID #: 655. The day after Plaintiff emailed the letter, Kevin Reynolds, Chief Human Resources Officer at YSU, accepted Plaintiff's resignation. ECF No. 48-10.

Subsequently, Plaintiff filed this action. In his Second Amended Complaint, Plaintiff brings seven claims. ECF No. 39. Count I is a Due Process claim. Counts II and III are Equal Protection claims. Counts IV through VII allege violations of Ohio law. Plaintiff brings this action against seven Defendants: Matanin, Howell, Tressel, Abraham, Reynolds, Kravitz, and Learman.

Defendants have filed an Answer (ECF No. 46) and a Motion for Judgment on the Pleadings (ECF No. 48).

## II. Conversion to a Motion for Summary Judgment

The Court exercises its authority under Fed. R. Civ. P. 12(d) to treat Defendants' Rule 12 motion as one for summary judgment under Rule 56. The Court informed the parties during the November 13, 2017 telephonic status conference that, based on discussions had so far, it was considering converting Defendants' motion. The status conference occurred before briefing on the motion was complete. Plaintiff eventually filed a memorandum in opposition which included 122 exhibits. Following Plaintiff's opposition, Defendants filed their reply. Defendants chose not to attach any documentary evidence to its reply (or seek leave to supplement its motion), even

5

(4:16CV2952)

though the Court had indicated that it was considering converting the motion and Plaintiff had attached voluminous amount of documents in its response. Thus, the Court has met Rule 12(d)'s requirement that the parties receive "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

### III. Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Johnson v. Karnes, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." Guarino v. Brookfield Twp. Trustees., 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of genuine dispute. An opposing party may not simply rely on its pleadings. Rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." Cox v. Ky. Dep't. of Transp., 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980

6

(4:16CV2952)

F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. The existence of some mere factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment. *Id*.

### IV. Discussion

Several of Plaintiff's claims allege violations of Section 1983 by government officials, acting in their individual capacities.

(4:16CV2952)

In cases brought against public officials in their individual capacities, the general rule is that "government officials performing discretionary functions are generally shielded from liability for civil damages, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis has two prongs: (1) whether the facts that a plaintiff has alleged or shown constitute a violation of a constitutional right; and (2) whether the right was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Clearly established means that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "the salient question . . is whether the state of the law . . . gave . . . fair warning that [the] alleged treatment . . . was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Once a state official "raise[s] a qualified immunity defense, 'it is the plaintiff's burden to prove that the state officials are not entitled to qualified immunity.'" *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006)).

### A. Count I: Due Process Claim

Count I of Plaintiff's Second Amended Complaint alleges that Defendants violated his Due Process rights when they "deprived [him] of the rights and privileges afforded the Assistant Professor position." ECF No. 39 at PageID #: 301. Plaintiff's brief clarifies that this claim encompasses his denial of a fair tenure review process. ECF No. 67 at PageID #: 632-33.

8

(4:16CV2952)

A procedural due process claim has three elements: (1) a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) a deprivation of that interest within the meaning of the Due Process Clause; and (3) the failure of the state to afford adequate procedural rights prior to deprivation of the interest. *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999).

Plaintiff contends that he was deprived of his interest in a fair tenure review process. At YSU, candidates on the tenure track receive a formal pre-tenure review in their third or fourth year of probationary employment. ECF No. 67-2 at PageID #: 646. Plaintiff argues that Howell impeded on this right by informing Plaintiff that he was going to recommend that Plaintiff not be re-appointed as tenure-track employee. ECF No. 67-4.

Because Plaintiff was a probationary employee, the recommendation to deny him re-appointment does not constitute a deprivation of a property interest. Plaintiff has not established that he was eligible for tenure. Indeed, Plaintiff had yet to undergo a pre-tenure review, a condition precedent to applying for tenure. *See* ECF No. 67-3. As a probationary employee yet to apply for tenure, Plaintiff does not have a property interest in his position. *See Beitzell v. Jeffrey*, 643 F.2d 870, 876 (1st Cir. 1981) ("In the absence of unusual circumstances, where a formal tenure system exists, that system confers no property interest on probationary employees") (citation omitted); *see also Haimowitz v. University of Nevada*, 579 F.2d 526, 528 (9th Cir. 1978) (holding that professor who had yet to achieve tenure did not have a property interest in continued employment). As the Sixth Circuit has held, "the reason for the probationary period required prior to tenure is to give the school authorities a chance to evaluate the teacher without

9

(4:16CV2952)

making a commitment to rehire him." *Blair v. Board of Regents of State University and Community College System of Tennessee*, 496 F.2d 322, 324 (6th Cir. 1974) (quotation omitted).

Plaintiff contends that he has a property interest in a fair tenure review process, but his failure to apply for tenure means that he has not attained that property interest. The Sixth Circuit has held that "a university "professor who is eligible for tenure consideration has some minimal property interest in a fair tenure review process."" *Webb v. Kentucky State University*, 468 F.App'x. 515, 521 (6th Cir. 2012) (quoting *Pursich v. Tennessee Technological University*, 76 F.3d 1414, 1423 (6th Cir. 1996)). Plaintiff cites *Webb* as support, but Plaintiff's case differs in one critical respect from Webb's: Webb was denied tenure, whereas Plaintiff did not apply for tenure. Additionally, Plaintiff had yet to go through pre-tenure review, a pre-requisite to applying for tenure.[2]

Plaintiff does not meet the first element of the Due Process analysis. Therefore, his Due Process claim fails. Because Plaintiff has not shown a violation of a constitutional right, the Court need not examine whether there was a violation of clearly established law.

---

[2] Plaintiff asserts that he was erroneously denied an appeal to the Professional Conduct Committee's determination, but he does not link this assertion to his Due Process claim. Instead, his Due Process claim focuses on the denial of a fair tenure review process. Plaintiff has not shown that his employment contract provides him a right to appeal the Committee's determination. Therefore, the Court finds that Abraham's purportedly incorrect assertion that Plaintiff did not appeal the Committee's determination (ECF No. 67-109) to be immaterial.

10

(4:16CV2952)

### B. Counts II and III: Equal Protection Claims

In Counts II and III of Plaintiff's Second Amended Complaint, Plaintiff alleges that Defendants violated the Equal Protection Clause of the Fourteenth Amendment by discriminating against him on the basis of his race.

To establish an equal protection violation in a Section 1983 case against a public employer, a plaintiff must show that the employer made an adverse employment decision with discriminatory intent and purpose. *Boger v. Wayne County*, 950 F.2d 316, 324-25 (6th Cir. 1991). A plaintiff must show disparate treatment; disparate impact is insufficient under Section 1983. *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (citing *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995)). When analyzing Section 1983 claims involving race discrimination in the public employment context, courts look to Title VII disparate treatment cases. *Id.* at 522 (collecting cases). In meeting his or her evidentiary burden, a plaintiff can use direct or indirect evidence. *Id.* If a plaintiff relies on indirect evidence, courts analyze that evidence under the McDonnell-Douglas framework. *Id.*

This framework consists of a three-step analysis. First, an employee must establish a *prima facie* case consisting of four elements: (1) the employee belonged to a protected group; (2) the employee suffered an adverse employment action; (3) the employee was qualified for the position; and (4) the employer replaced the employee with a person outside the protected class or treated the employee differently than similarly-situated non-protected persons. *Thompson v. Ohio State University*, 639 F. App'x. 333, 340 (6th Cir. 2016). Then, the burden shifts to the employer to offer a legitimate non-discriminatory reason for its decision. *Id.* at 341. Finally, the

11

(4:16CV2952)

burden returns to the employee, and the employee must show that the employer's proffered reason was merely a pretext for discrimination. *Id*.

### i. Plaintiff's *Prima Facie* Case

Elements 1 and 3 are not in dispute. Plaintiff is African-American and Defendants have not asserted that he lacks the minimum qualifications for the job. Elements 2 and 4, however, are in dispute.

As to the second element, Defendants contend that Plaintiff has not suffered an adverse employment action, because he resigned. ECF No. 48 at PageID #: 371-72. In response, Plaintiff argues that his resignation was the result of the discrimination he faced, and therefore, amounts to a constructive discharge. ECF No. 67 at PageID #: 629-30. In reply, Defendants argue Plaintiff has not established facts to support his conclusory allegation. ECF No. 68 at PageID # 1541.

To establish a constructive discharge, a plaintiff must show two things: (1) the employer deliberately created working conditions a reasonable employee would find intolerable; and (2) the employer created these working conditions to induce the employee to quit. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (citation omitted). In determining whether working conditions proved intolerable, the Sixth Circuit has analyzed the following factors: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the

12

(4:16CV2952)

employee's former status." *Id.* at 569 (quotation omitted). Additionally, constructive discharge is established when an employee reasonably believes his or her termination is imminent. *Becker v. Elmwood Local School Dist.*, 519 F. App'x. 339, 342 (6th Cir. 2013) (citation omitted).

In this case, a genuine issue of material fact exists as to whether Plaintiff was constructively discharged. In particular, multiple events suggest Plaintiff was suffering harassment calculated to encourage his resignation.

In his letter of resignation, Plaintiff claims that Howell and Matanin were discriminating against him. ECF No. 48-9. He wrote that Matanin gave him a poor evaluation due to his race and that Howell attempted to get him to agree to the falsification allegations in order to allow Howell and Matanin to jettison him from his teaching position. *Id.* Whether these assertions are credible are claims for a finder of fact.

Moreover, Plaintiff wrote a letter to Tressel and Abraham dated October 8, 2015 detailing his concerns with Matanin and Howell. ECF No. 48-7. In the letter, Plaintiff contends that Matanin was giving him evaluations lower than she gave Caucasian professors based on his race. *Id.* at PageID #: 420. Additionally, he wrote that he thought Matanin and Howell were trying to pin the purported falsification of data in the SPA report on him when Matanin was the individual that instructed Plaintiff to include the data in the report. *Id.* at PageID #: 419. Defendants may argue that Abraham forwarded this letter to Cynthia Kravitz for her to investigation (ECF No. 48-8), but there is no evidence that Plaintiff was informed of this. Thus, from Plaintiff's perspective, his claims were not being investigated. Indeed, Defendant resigned on October 31,

13

(4:16CV2952)

2015, and Kravitz did not begin an investigation into Kravitz's allegations until November 4, 2015. ECF No. 48-13.

In addition, Plaintiff may be able to prove constructive discharge under *Becker*, as Plaintiff only submitted his letter of resignation after Howell told Plaintiff that he planned to recommend that YSU not renew Plaintiff's contract. ECF No. 67-4.

The parties also dispute the fourth element in the *prima facie* case: whether Plaintiff was treated differently than similarly-situated employees. Plaintiff claims that Matanin gave him and other African-American faculty ratings of "weak" or "very weak," ratings that no Caucasian faculty members received. *See* ECF No. 67-6.

In addition, Plaintiff argues that Matanin rated the majority of Caucasian faculty as "very strong" or "strong" in teaching, but he received a rating of "weak." ECF No. 67 at PageID #: 637. An unsupported claim that his lower evaluation was based on his race would prove insufficient to prove discrimination. *See Sharma v. Ohio State University*, 25 F.App'x. 243, 247 (6th Cir. 2001) (holding that claim that evaluator gave employee low scores on evaluation did not demonstrate discrimination when employee offered no argument regarding scores he claimed he should have received). In this case, however, Plaintiff has offered evidence that suggests a rating of "weak" was inconsistent with ratings of "very strong" that Caucasian professors received.

Specifically, Plaintiff argues that Matanin's ratings of Drs. Ratican and LaVine show that Plaintiff was treated differently than similarly-situated Caucasian colleagues. Drs. Ratican and LaVine, both Caucasians, received ratings of "very strong" in teaching for the 2014-15 teaching year. ECF Nos. 67-59 at PageID #: 1163 & 67-45 at PageID #: 1030. Plaintiff claims, however,

14

(4:16CV2952)

that the scores he received from student evaluations were similar to the scores Drs. Ratican and LaVine received. ECF No. 67 at PageID #: 637. He claims that 51.99 percent of students "strongly agreed" with statements in favor of Plaintiff's teaching, similar to the 53.39 and 53.94 percent of students that marked "strongly agreed" for Drs. Ratican and LaVine in the 2014-15 Academic Year. *See* ECF No. 67-6. This discrepancy raises a question of material fact as to whether a discriminatory intent affected Matanin's evaluations.

### ii. Legitimate non-discriminatory reason and pretext

There are two purportedly legitimate reasons Defendants may offer as justifications for their actions toward Plaintiff: (1) the allegation that Plaintiff falsified data in the SPA report; and (2) Plaintiff's poor evaluation scores.

As to the first reason, Defendants may point to the charges that Plaintiff was facing due to the purported falsification of data as evidence that Howell was justified in recommending not to retain Plaintiff. In fact, the Professional Conduct Committee found that there was sufficient evidence to support the allegation that Plaintiff created and falsified assessment data in the SPA report. ECF No. 48-12.

As to the second reason, Matanin rated Plaintiff's teaching as "weak" in her evaluation of Plaintiff during the 2014-15 year. ECF No. 48-2 at PageID #: 388. Additionally, Plaintiff's accusation of a student lying to him (ECF No. 48-3 at PageID #: 409) suggests validity in concerns Matanin may have had regarding Plaintiff's communication skills and professionalism.

Plaintiff disputes both of these reasons as pretextual.

15

(4:16CV2952)

In regards to the falsification charge, Plaintiff met with Howell on September 24, 2015. Howell drafted a summary of the meeting, but Plaintiff disputed large portions of that summary. ECF Nos. 67-89 & 67-90. For instance, in regard to the claim that Plaintiff included purportedly false data in the SPA report, Plaintiff stated that Matanin directed him to include that data in the report. ECF No. 67-89 at PageID #: 1428. This raises a question of material fact as to whether Matanin knew the data was falsified. Additionally, Howell had informed Plaintiff of his intention to recommend against renewal of Plaintiff's contract prior to completion of the Professional Conduct Committee' investigation. The timing creates a question of material fact as to whether Howell was justified in relying on the charge as a basis for recommending non-renewal.

In regards to Plaintiff's evaluations, he argues that his rating of "weak" in teaching is inconsistent with Matanin's rating of the majority of Caucasian faculty as "very strong" or "strong" in teaching. ECF No. 67 at PageID #: 637. As detailed above, Plaintiff has put forward evidence that Drs. Ratican and LaVine received higher ratings than him, even though all three had a similar percentage of "strongly agreed" ratings from their students. Although a fact finder may find other reasons to support Matanin's assessment of Plaintiff's teaching, there is a question of material fact as to whether Matanin's evaluations were pretextual.

Thus, there are material issues of fact on Plaintiff's claim that Matanin and Howell discriminated against him.

16

(4:16CV2952)

### iii. Proper Parties

Defendants argue that Plaintiff has failed to show that operative facts support the inclusion of each named Defendant. ECF No. 48 at PageID #: 368-69.

The Sixth Circuit has held that "to establish liability and overcome a qualified immunity defense, an individual must show that ... the violation was committed *personally* by the defendant." Robertson v. Lucas, 753 F.3d 606, 615 (6th Cir. 2014) (emphasis in original). A Section 1983 plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). A mere failure to act is insufficient to establish liability. Poe v. Haydon, 853 F.2d 418, 429 (6th Cir. 1988) (dismissing sexual harassment claim against supervisory personnel because there was no allegations that the supervisory personnel authorized or actively participated in the harassment).

In this case, there have been no facts put forward to establish active conduct by Tressel, Abraham, Reynolds, or Kravitz. Tressel and Abaraham received Plaintiff's message that he was facing discrimination, and, within an hour of receiving the message, Abraham forwarded the message to Kravitz. ECF No. 48-8. Kravitz then conducted an investigation into the matter. ECF No. 48-13. Reynolds simply accepted Plaintiff's resignation. ECF No. 48-10.

Additionally, there are no facts supporting a claim that Learman engaged in unconstitutional behavior. Plaintiff argues that Learman improperly engaged in a "tripartite meeting" with Howell and Matanin to "scheme to find Plaintiff guilty of an offense that he did not commit." ECF No. 67 at PageID #: 622. Plaintiff alleges that such a meeting was in

17

(4:16CV2952)

violation of Professional Conduct Committee policy, but that is not so. Actually, the chairperson of the Committee is required to meet with individuals who claim to have observed or discovered violations of professional misconduct. ECF No. 67-121 at PageID #: 1529-30. Even if Howell and Matanin were trying to fabricate a claim against Plaintiff, Learman was not violating Plaintiff's rights by performing his duties as chair of the Committee by meeting with individuals alleging professional misconduct. Thus, Learman's meeting with Howell and Matanin does not constitute unconstitutional behavior on Learman's part.

There are, however, as detailed above, sufficient facts to suggest that Howell and Matanin may have engaged in actions violative of Plaintiff's right to equal protection.

### iv. Clearly Established Law

Having shown that there are questions of material fact related to Plaintiff's Equal Protection claims, the Court now examines the second prong of the Section 1983 analysis: whether Matanin and Howell's actions violated clearly-established law.

Matanin and Howell are not entitled to qualified immunity. Taking adverse actions against a person because of his race violates the Equal Protection Clause. *Rose v. Mitchell*, 443 U.S. 545, 554 (1979) ("Discrimination on account of race was the primary evil at which the Amendments adopted after the War Between the States, including the Fourteenth Amendment, were aimed. The Equal Protection Clause was central to the Fourteenth Amendment's prohibition of discriminatory action by the State."). Viewing the facts in a light most favorable to the non-moving party, Matanin and Howell's actions that forced Plaintiff to resign are actions taken on account of race, and therefore, do not merit qualified immunity.

(4:16CV2952)

### C. Counts IV-VII: State Law Claims

Counts IV through VII of Plaintiff's Second Amended Complaint alleges violations of Ohio state law. Defendants claim that they are immune from suit on these claims. ECF No. 48 at PageID #: 375-76. They argue that, pursuant to R.C. §§ 9.86 and 2743.02(F), the Ohio Court of Claims must first determine whether they are entitled to personal immunity. *Id*.

R.C. § 9.86 provides, in relevant part,

> no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

R.C. § 2743.02(F) states,

> A civil action against an officer or employee ... that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code . . .

Accordingly, the Court lacks jurisdiction over Plaintiff's state law claims against Defendants in their individual capacity. *See Min Li v. Qi Jiang*, 38 F.Supp.3d 870, 878 (N.D. Ohio 2014) (Pearson, J.) (dismissing claim against department chair in his individual capacity because the Court lacked jurisdiction over state law claim).

### V. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion. It is granted in all respects, except for Plaintiff's Equal Protection claims against Howell and

19

(4:16CV2952)

Matanin.[3]  To the extent the motion is denied, it is denied without prejudice to refiling as a Rule 56 motion, upon completion of any remaining discovery.

    IT IS SO ORDERED.

| | |
|---|---|
| March 29, 2018 | */s/ Benita Y. Pearson* |
| Date | Benita Y. Pearson |
| | United States District Judge |

---

[3] Similar results would have been reached under Rule 12 standards.